CALEDONIA,
March,
1831.

Bell
*vs.*
McLeran.

———————

## AZARIAS WILLIAMS *vs.* MATTOCKS, admr. of JOHN MURRAY.

When lands are conveyed by will to three persons in trust, and to the survivors and survivor of them, and the same three are made executors, all, living, must join in a conveyance, in order to pass the title.

One of these, acting as sole executor, cannot, by virtue of that authority, convey the title.

The representations of such sole executor, that he had power, as such, to convey the title of his testator, when he had no such power, operates as a fraud upon the grantee, the purchaser by quit claim deed, by reason of which the Court will decree the securities for the purchase money to be delivered up to be cancelled.

After the purchaser has been twenty years without title, and with no beneficial use of the land purchased, and the interest upon his debt more than doubling the debt, the Court will not compel him to accept a confirmation of title, and pay the remainder of the purchase money. The defendant must remove all suspicions of fraud in. his intestate, before he can urge the purchaser to receive a confirmation of his title.

The defendant, *John Mattocks*, as administrator of *John Murray*, heretofore brought his action against the orator upon a bond in the penal sum of $5,000, conditioned for the payment of $2,500, with interest, and dated December 1st, 1806, which action was, at the time of the trial of this case, still pending in court in the county of Caledonia. *Mattocks* also, as administrator, as aforesaid, heretofore brought his bill in chancery before this Court against *Williams*, praying for a decree of foreclosure of the equity of the orator in and to a large tract of land in the township of Jay, in the state of Vermont ; *Williams* having, on said 1st day of December, 1806, conveyed said large tract of land to *Murray* in his life time, by a mortgage deed, to secure to him the payment of the sums due upon said bond ; which bill in chancery was now pending before this Court. Since the pendency of the action on the bond, and the bill in chancery, *Williams* filed in this Court his cross bill, praying for a perpetual injunction upon the suit at law, and upon the bond and mortgage deed, and upon any action that might, at any time, be commenced or prosecuted upon either of them, and also praying for general relief. *Mattocks* answered the cross bill of *Williams* ; and his answer and his supplementa-

CALEDONIA, ry answer were traversed by *Williams*; and the testimo-
March,
1831. ny was taken and published; and the cross bill was set down for a

Williams hearing, and was heard at this present term. The solicitors
*vs.*
Murray's,admr. for the parties agreed that the merits of all their controversies were
fully presented to the Court on this hearing. The ground as-
sumed by *Williams*, the orator, was, that he bought of *Murray*
the same tract of land, and paid, at the time of purchase, fifteen
hundred dollars, and gave said bond for the remaining purchase
money, being $4,000 in the whole, and gave back the mortgage
deed of the same land, to secure the payment of said money owing
upon the bond; and that *Murray*, gave to him, the orator, a quit-
claim deed only, falsely and fraudulently representing, that he had
power to make a good title to the lands, when, in fact, he had
none at all. The particulars of the fraud charged in the transac-
tion were, that *Murray* falsely and fraudulently represented to the
orator, that one Jacob Watson, then late of the city, county and
state of New-York, deceased, formerly owned said tract of land,
and died seized of it; that Watson, before his decease, made
and published his last will and testament, which had since been
duly approved and confirmed; in and by which will the said
Watson, among other things therein contained, did authorize and
fully empower his executors therein named, or such one of them
as should qualify and act under the same, to sell and convey all his
lands and other estate whatsoever and wheresoever, at and for such
considerations or sums of money, as should be deemed adequate;
and that he the said *Murray* was sole acting executor of the last
will of Watson, deceased; and that *Williams*, relying upon the rep-
resentations of *Murray*, and believing the same to be true, took the
quit-claim deed, and made the payment, and gave the securities
aforesaid; whereas in truth and in fact said representations were
not true; that Watson did never own the said tract of land; that
*Murray* was not then sole acting executor of the will; and that
Watson in and by said will gave no such authority to his sole acting
executor to sell said lands; and that no title whatever passed to
*Williams* by the deed of *Murray*.

The answers and the testimony are sufficiently noticed, in the
arguments of the solicitors, and in the opinion of the chancellor, to
be intelligible without further recital here.

It may be mentioned here, that *Murray's* deed to *Williams*
alluded to the will of Watson by an erroneous date, which, after
all the testimony is in, becomes of no consequence whatever; and
needs no recital of testimony or arguments.

*Arguments for the orator.*—The first thing, that arrests our attention in these proceedings, is the misrepresentations of *Murray*. The misrecital of the date of the will, perhaps, chancery would pass over; but the misrepresentation of the executor's powers, as such, is insufferable. The words of the *will* are, "I give and demise unto *John Murray*, Edmund Prior, and Jacob F. Watson, and to their heirs and assigns forever, all my lands, &c. "Item. I direct and appoint that my said executors and trustees, or the survivors or survivor of them, do in such manner as they shall judge best, sell and dispose of all of my lands," &c. The deed recites that, "whereas, Jacob Watson, in and by his last will and testament, did authorize and fully empower his executors therein named, or such of them as should qualify and act under the same, to sell and convey all his lands," &c. *John Murray* here assumes to act by virtue of an express power delegated to him by Jacob Watson's will, and the probate of the same, and letters of administration. If the power assumed by him be not given by the will and letters of administration, nor either, then his acts by virtue of such power, are a nullity, and the deed void. But the power delegated by the will to act in the premises, is to the said *Murray*, Prior and J. F. Watson, trustees and executors, to their survivors or survivor, and not to his executors, or such of them as should qualify and act. Does it not, then, necessarily follow, that the doings of said *Murray* are void? But, supposing this difficulty removed, there are others absolutely insurmountable. The *jus accrescendi* has not attached. The bill alleges, and the answer admits, that Edmund Prior is still living; nor can this *jus accrescendi* attach as long as Prior and Watson have heirs; because the trust is made to *Murray*, Prior and Watson, and to their, &c. By what authority, then, can *Murray* assume to act alone, in discharging this trust? Not by the power given in the will. Not by the power given in the letters testamentary. The *will* delegates a joint power to *Murray*, Prior and Watson, and to their survivors or survivor. Not a word as to power delegated to his executors, or such of them,as should prove the will, and act as such. The intention of the testator, expressed in this will, is to be perfected. The power, delegated in the will, is a joint power. If the testator's intention was not that it should be jointly exercised, why was not the delegation of power in severalty? If the testator intended that such of his executors as qualified should be clothed with this power, why did he not so

CALEDONIA,
March,
1831.

Williams
*vs.*
Murray's,admr.

CALEDONIA,
March,
1831.
———————
Williams
vs.
Murray's,admr. express it ? It is most manifest, that, so long as any two of the trustees or executors were living,it was the intention of the testate that no one of them should act solely, and independently of the other. But it does not appear that Prior and Watson refused the trust, or to act as executors. And, if *Murray* could deed under the power given in the *will*, Prior and Watson could each deed under the same power : and which would be the efficient deed ? But it is contended, that as this is a joint power and a joint trust, nothing whatever passes by the deed of *Murray*, Prior, one of the joint trustees and executors, living. For a sale by executors, under a power in the will, is void unless the same be by the whole number named therein.—1 *Co. Litt.* 169 ; 3 *Pick.* 244, *Sutton* vs. *Cole* ; 2 *John. Chan. Ca.* 19-20, *Osgood* vs. *Franklin.* The *statute of Henry VIII.* never attached in this state. In New York, they have a statute of similar import, which authorizes the acting executor to sell, in case of neglect or refusal of the rest of the executors to act. But the will of Jacob Watson and the letters testamentary in New York vested no power in, nor controll over, the lands of the testator lying in this state. He could sustain no action for the same, without first proving the will here and taking letters testamentary. An executor or administrator appointed abroad has no authority in this state.—1 *Johns. Chan. Ca.*156, *Morrel* vs. *Dicky* ; 2 *Co. Litt.* 292 ; 5 *Co.* 143, *Russel's case*; *do.* 144, *Middletown case* ; 1 *Salk.* 307 ; 2 *Mass. Rep.* 384, *Sel. Men* vs. *Boylston* ; *Brayton's Rep.* 92, *Lee* vs. *Havens.* Administrators abroad cannot assign a mortgage.—1 *Mass. Rep.* 81.

The disposition of effects, left vacant by the owner, is wholly a matter of municipal regulation. This is the foundation of the power of courts of probate. Their jurisdiction is *in rem,*and in its nature local. It would be contrary to sound policy to admit a foreign administrator directly or indirectly to administer upon the estate of the deceased lying in this state. The statute of Vermont has pointed out the manner in which a will, probated abroad, shall be proved here.—*Vt. Stat. p.* 337, *s.* 23. If the probate abroad gives jurisdiction here, this statute is unnecessary. If courts here have jurisdiction, courts of foreign jurisdiction are necessarily excluded. If a citizen of New York, through the intervention of trustees, appointed by will, and a probate of the same in that state, can withdraw the effects of the testator, lying in this state, of which he died seized, the courts of probate, in this state, are necessarily ousted of jurisdiction. If *John Murray* did not

CALEDONIA,
March,
1831.

Williams
vs.
Murray's admr.

derive power, by virtue of the *will* and letters testamentary, to deed said lands to the orator, the deed is a nullity, and the consideration of the bond in question has totally failed.    Upon failure of consideration equity relieves.–3 *P. W.* 307 ; 1 *Fonb.* 366 ; 1 *Ves.* 88 ; *Co. Litt. a.* 384 ; *Sugden's Vend.* 316 ; 18 *Viner,* 113.

If the deed of *Murray* to *Williams* had been with the usual covenants, the covenants might have been a legal and equitable consideration for the bond.    And, if *Murray* had been seized in fact of the lands in question, whether by right or wrong, something might have passed by the deed, and, in either case, equity might not relieve unless to prevent circuity of action.    Relief in this case is not prayed for because of a defective title, but because there was no *power* in the executor to pass any title ; and no title, not even an inchoate one, has passed to the orator.    If equity will not interfere, the orator is remediless.

But there is another view of the subject.    The bond set forth in the bill was executed in 1806 ; the deed to *Williams* by *Murray* in 1807 ; the mortgage deed in 1808.    The suits upon the bond and mortgage were commenced in 1828, more than twenty years afterwards ; and Watson's estate, all this time insolvent.— Why this extraordinary delay ?    Why have not creditors, legatees, heirs, or somebody,  looked into this business ?    Six or seven thousand dollars are worth something to creditors, who are decreed a dividend.    But the proceedings of the respondent, since the filing of the bill, give us a clue to this mystery.    At the time this bill was filed there  was no title of  record,  whatever, in Watson, Jay's deed to him has been procured and recorded since.    How does the  orator know when this deed was executed ?    The will of Watson has been procured to be probated in this State by Prior, as trustee and executor of Watson with *Murray* ; and a deed from Prior to the orator  to be executed.    Who knows the identity of this Prior ; and where has he slept for thirty years, that he has not taken upon himself the  trust and administration ?    What induces him now to come forward, when Watson's creditors and heirs are in their graves, to collect this bond and enforce this mortgage ?    This bond and mortgage, if of validity, are  assets of the estate of Jacob Watson, belong to his creditors and his heirs, whose legal representative Prior is,  and  do not belong to the estate of *John Murray.*    Why, then, are not the suits in the name of Edmund Prior, and not in the name of  *John Mattocks* ?    Why has the orator had his property attached ?    Why put to great

CALEDONIA,
March,
1831.

Williams
vs.
Murray's, admr.

trouble and expense, when, confessedly, he had no title whatever ? What satisfactory answers can be given to these questions ?

By force of the doctrine of *jus accrescendi*, and the terms of the will of *Watson*, the whole estate and power to deed vested in Prior. He could have perfected a good and complete title, in law and equity, in any one, independent of *Williams*. *Murray's* deed is a nullity, because he had no power to deed, but jointly with his co-trustees and executors; (all of whom were living at the date of his deed to *Williams*;) nor without first probating the will in this state. The whole defence rests upon the foundation, that *Murray* had the sole power to deed, given him by the will. The contract was made with that understanding, and, if *Murray* had not such power, the defence fails. Whatever power *Murray* had to deed was derived from the will. If the power, delegated by that, was not exercised in deeding, the deed is a nullity. So far from professing to exercise this power, *Murray* expressly abandons it, and sets up and recites a power, independent and distinct from the will. He cannot excuse himself by saying there was a mistake. He had the custody of the will. He undertook to recite it, and the power, given him by it, to deed. No such will as here recited is to be found; no such power, as set forth in the deed, is to be found in the will produced. What then is the result ? Why, that so much of the deed, as recites the will, and enumerates the powers given in it to *Murray* to deed, is surplusage, and to be expunged, in construing the deed. Erase this, and the deed stands as the sole deed of *Murray*, inoperative and null. He sets his own hand to it; affixes his own seal; and acknowledges it in his own name.

But it is said, that the will offered gives power to Watson's trustees and executors to deed, and that *Murray* was one of them; and here is a mistake in writing the powers. Be it so. For that very reason the deed is void, and there is no remedy. Here is no latent ambiguity. No averments out of the deed can be received to add to or explain it. Here either is, or is not, such a *will*, as the one set forth in the deed. If there be not such a will, the deed is inoperative; because *Murray* assumed powers which he had not. If there be such a *will*, the one offered is of no validity, as being executed anterior to the one cited in the deed. There is a manifest distinction in one's applying for leave to correct their own mistakes, and being called upon by others to correct them. But even had the deed contained covenants of warranty, binding *Murray* in his individual capacity, the orator is

CALEDONIA,
March,
1831.

Williams
vs.
Murray's admr.

'entitled to relief.—*Parker* vs. *Parmalee*, 20 *Johns. R.* 135. If the deed be inoperative, the grantee may recover back the purchase money.—*Van Eps* vs. *Schenectady*, 12 *Johns. R.* 436. *Murray* must have had the power to deed at the time of the agreement, or the deed is void.—**** vs. *Way*, 11 *Johns. R.* 527. If there be no title, chancery will not lend aid to the party. The court will not incline to perfect a title after a lapse of many years.—1 *Mad.* 348. There must be a title at the time ; for it would be inequitable and unjust to force one upon the orator after a number of years.—*Woodcock* vs. *Bennet*, 1 *Cowen*, 711.

It was further contended that the circumstances of the case afforded no equity for a decree of specific performance on the part of *Williams* : that there was no mutuality or reciprocity of rights and remedies, without which a specific performance would not be decreed.

*Argument for the respondent.*—The burden of complaint is, that *Murray* fraudulently represented to *Williams* that Watson died seized of the lands ; that he, *Murray*, was empowered to sell ; that, relying on *this*, *Williams* bought by quit-claim ; but obtained no title, and ought not to pay.

As the answer denies all fraud, and none is proved, nor any statement about title, except in the deed, *Murray* to *Williams*, it would seem, that the general principle, that a quit claim-deed, from its very nature and language, precludes all remedy, is a sufficient answer to this bill. But, to remove *all* doubt and colour of complaint or hardship, the defendant proceeds to show a perfect title in *Williams.* The charter vests the title in John Jay. The deed from John Jay and wife of 29th of January, 1794, duly proved, conveys the same to Jacob Watson. The will of Jacob Watson authorizes his executors to sell ; by virtue of which *Murray*, sole acting executor, sold to the plaintiff. If *Murray* had authority, under the will, to convey the title, without the co-executors joining in the deed, then *Williams* obtained a good title. But, suppose *Murray* could not *alone* pass the title; it is in proof, that Jacob F. Watson, one of the executors, died before Jacob Watson. It cannot be pretended but the two survivors, *Murray* and Prior, could deed, as no time to deed is limited by the will. A confirmation deed of Prior, of 27th of September, 1830, is now produced, and offered to the orator, by the defendant. This, and the deed of *Murray*, perfect the title in *Williams.* If the deed of *Murray* is void, then the deed of Prior, as only surviving

CALEDONIA,
March,
1831.

Williams
vs.
Murray's adms.
executor is good, as coming within the very words of the will. Defendant has caused the deeds, Jay to Watson, and Prior to Williams, to be recorded in the town of Jay ;—and a copy of Watson's will to be recorded in Orleans district, where the lands lie, according to statute, page 337 ; and *then* a copy of said probate record to be recorded in the town of Jay. Thus the town records of Jay show complete evidence of title in *Williams*.

The only remaining question is, whether it is competent for the defendant to perfect an inchoate title *after bill filed*. Authorities are abundant, that this may be done, and so is the strong reason of the case.—1 *Maddock*, 437, 439, 441 ; 2 *Swift's Dig.* 93-4-5 ; 5 *Cranch*, 262, Hepburn vs. *Auld*. This perfecting the title has relation back to the time of the purchase.—2 *Swift's Dig*. 93-4. If not so, it is sufficient in equity, that his title is *now* good. If *Williams* has sold part with covenants of title, this closes all breaches of his covenants. If one agrees to sell lands he has not, and afterwards acquires them, he shall be compelled to perform this agreement.—1 *Maddock*, 389. *If so*—in case A advance B $100, on such agreement, and go into chancery to get it back, why not compel A to take the land, if B proves title and so desires !

The defendant's solicitors further contend, 1 That Prior, the only surviving executor or trustee of Watson's will, having recorded the will in Vermont, and executed a confirmation deed to *Williams*, which removes all doubts as to *Williams'* title, *Williams* would be entitled to no relief. If the title was defective, there being no covenant nor fraud. And,

2. That *Williams*, having never been disturbed in his possession of the land, the title being now confirmed, and he having sold many lots of the land, has certainly no ground of complaint now: for vendor can buy in the title, even after action brought, and protect himself ; and chancery will order a specific performance if orator seeking it can make title at the time of the hearing, though acquired after the contract.—*Boswell* vs. *Vaughan, Cro. James*, 197 ; *Medina* vs. *Stoughton*, 1 *Salk*. 210 ; *Frost* vs. *Raymond*, 2 *Caines*, 188 ; *Bree* vs. *Holbeck, Doug.* 654 ; *Thompson* vs. *Miles*, 1 *Esp. Rep.* 183 ; *Sugden's law of vendors*, 250 ; *Higby* vs. *Smith* & *Boyden*, 1 *Chipman*, 409 ; 1 *Suift*, 401 ; 3 *Starkie's Ev.* 1614 ; *Christman* vs. *Gardner*, 5 *Johns. Chan. Rep.* 29 ; *Grovener* vs. *Elmendorf, same*, 79 ; *Hepburn* vs. *Auld*, 2 *U. S. Condensed Rep.* 247.

HUTCHINSON, Chancellor, pronounced the decree of the Court.

CALEDONIA,
*March,*
1831.

Williams
*vs.*
Murray's admr

In disposing of this case, it is necessary to ascertain what is the fair construction of the will of Jacob Watson, and what powers are therein given to those, who have attempted to act in pursuance of those powers. To this point, the words of the will are, " I give and demise unto *John Murray*, Edmund Prior, and my grandson, Jacob F. Watson, all of the city of New York, &c., and to their heirs and assigns forever, all my lands, tenements and hereditaments whatsoever, and wheresoever, whereof I have any power to dispose." Then follows a similar bequest of all his debts and personal estate, wherever they may be. The will then proceeds as follows, " I do nominate and ordain them, the said *John Murray*, Edmund Prior, and Jacob F. Watson, and their survivors and survivor of them, executors of this my last will and testament. Nevertheless, my trust and confidence, in them reposed, is, and my aforesaid device, gift and bequest, to them, is upon this special trust, that they shall sell, employ, and dispose of, all my said lands, tenements, and hereditaments, for such purposes, and to such persons, and in such sort, and manner, and form, as, in and by said will, is appointed and directed concerning the same ; also, all my said goods," &c. " Item. I direct and appoint, that my said executors and trustees, or the survivors, or survivor of them, do pay all my just debts, &c. as soon as possible after my decease." The will then proceeds to direct, that the said executors and trustees, or the survivors, or survivor of them, sell and dispose of all his lands, &c. It always preserves the expression, executors and trustees, or survivors or survivor of them.

It is evident, that this will does not create, in the executors, a mere power to sell, as executors ; but vests the estate in the three and survivors or survivor, in trust, for the purposes in said will named ; to wit, to sell and pay debts and legacies. While the three are alive, all must join in a conveyance, to render it valid. The will makes no provision for the event, that a part refuse to accept the trust. The testator has committed the trust to the united skill, judgement, and fidelity of the three. Neither of them can make a title alone, unless he has become the only survivor of the three. He can convey no title, even to the one third vested in him ; for the law will not permit such an execution of a trust, as will render purchasers tenants in common with the trustees, or with any of them. This would injure the value of the trust estate. If a part of these trustees refused or neglected to accept and ex-

CALEDONIA,
March,
1831.

Williams
vs.
Murray's admr.

ecute the trust, the executor, who acts, must either proceed as executor, and sell under such authority from the probate court as the laws will sanction, or he must apply to a court of chancery for a decree compelling the other trustees to act, or appointing others in their stead. Nothing, like either of these modes, seems to have been adopted ; but *Murray*, as executor, not as trustee, and with no order from any court of probate, has attempted to convey these lands to the orator. And had he acted under an order from any court of probate, it could have availed nothing as an authority to convey the lands of the testator, lying in this state, unless procured from a court of probate in this state, and, under circumstances, in which the laws of this state will sanction such an order. More evidently still, if possible, could he convey no title to lands in this state, as executor, till he had become executor, and given bonds, in this state, as the law requires.

As nothing appears to render valid *Murray's* conveyance as executor, we will examine whether he had any right whatever to convey these lands, while acting alone, because if he had such right, possibly the misdescription of this right, in his deed to the orator, would be such a defect, as might be cured by some order of this Court. If *Murray* could convey at all, it must have been as surviving trustee. This he evidently was not ; for Edmund Prior, one of said trustees, is still living. His testimony is produced and read to us : and the defendant has procured a deed of a recent date from him to the plaintiff, with a view to perfect the title in the plaintiff, and remove the grounds of his complaint. It appears also by Prior's testimony, that Jacob F. Watson was alive, and was consulted about the estate of the testator, after the date of *Murray's* deed to the plaintiff. This warrant taken to be true, notwithstanding the defendant answers, that he verily believes, that Jacob F. Watson died before the testator. He answered before he saw the testimony of Prior ; and his belief must have come from general report, merely, for he does not pretend to know the fact. But Prior swears to his own knowledge, that he was alive many years after the decease of the testator.

Hence it appears, that all three of the trustees were living in the city of New York at the time when *Murray* contracted to sell, and gave his deed, to the orator.

If the position were tenable, that the decease of one trustee, and declining of the trust by another, or declining by both, would render the deed of *Murray* alone of any validity, (which position we by no means sanction,) still the evidence does not support

Caledonia,
March,
1831.

Williams
vs.
Murray's admr.

the fact. The defendant has answered, that he believed Prior declined the trust; but the testimony of Prior, since taken, relates such consultations with *Murray*, about the estate of the deceased, as render it doubtful whether the information of the defendant was correct, when he penned his answer, and he did not presume to answer from any personal knowledge of the matter. Moreover, the first probate of the will makes no mention of Prior's declining, nor does it assign any reason why *Murray* qualified alone. If Prior had declined, that would have been a good and natural reason to have assigned in the probate, for the qualifying of *Murray* alone.

On every ground, therefore, the deed of *Murray* to the orator is invalid. It conveyed no title whatever. And the orator, of course, received no value for the payments made by him and the bond he gave, and the mortgage deed to secure the remaining payments of $2,500. He contracted to purchase the title of Watson in these lands. As the business was done, he obtained no such title.

Now, if this had all occurred in good faith, with no grounds to support fraud, and the representatives of *Murray* could now make the title good in the orator, under circumstances as beneficial for him as if the title had been good in the outset, this is all the remedy the Court ought to grant. But the evidence does not present such a case. The most charitable construction of the transaction on the part of *Murray* would be, that he was not sufficiently careful to know whether his representations were a correct disclosure of his powers. That he represented, and made the orator believe, that he had power to convey all the title of Watson, while acting as sole executor of his will, we can entertain no doubt. He represents all this in the preamble to his deed. That the orator believed it, is evident from his accepting a quit-claim deed, and making his payment in part, and giving securities for the remainder. Yet this proves not to be a reality; so far from it, that the orator could not have compelled the other trustees to convey, had he applied to chancery forthwith, unless he proved their agreement to his contract with *Murray*. There are strong grounds to presume that *Murray* was intentionally wrong in this business. It seems morally impossible, that he should have supposed his deed good to convey the title of Watson. He appears to be a man of business and had the custody of the will; if not, he ought at his peril to become acquainted with its contents before he proceeded to act under its authority. This is a full answer to the suggestion, that the

CALEDONIA, orator was bound to discover what title he was acquiring by his
March,
1831.    quit-claim deed.   This might be true, while he should act from
Williams  his own knowledge, and not from the representations of the defen-
vs
Murray's admr. dant.   But, while the defendant had all the means of knowledge,
and undertook to represent his power to convey the title of the
deceased, he must not be permitted to deny the orator's right to
trust to his representations.   That would be sealing the transaction
as a remediless fraud.

Thus we necessarily come to the conclusion, that the orator is
entitled to some sort of relief ; and that ought to be appropriate
and adequate.   The defendant has lately taken measures to con-
firm the title in the orator, by procuring the deed from Jay to
Watson to be recorded, and procuring a deed from Prior, who is
now the only survivor of the three trustees named in Watson's will.
The orator is not willing to accept of this.   It is suggested, that
this deed from Prior is defective in description, &c.   If this were
the only objection, we could give time for the execution of a deed
by him, that would remove that objection.   But there are other
more important difficulties.   About twenty years have elapsed,
during which the orator could make no sales of his property, which,
by its quantity, he must have purchased with a view to sell again,
for it is not to be presumed that men would purchase farms in a
town where no title appears of record in the person of whom they
would purchase.   And, if he did sell, he would only plunge him-
self into greater difficulty, and, probably, into numerous law suits.
During all this period, the interest upon his debt has been accu-
mulating, taxes upon the land multiplying, and the value of the lands
not increasing, but, perhaps, diminishing.   These circumstances
render it inequitable that we should compel the orator to be satisfied
with this confirmation of title, and leave him liable to pay the remain-
der of the purchase money with its accruing interest.   The ora-
tor's case is peculiarly hard at best.   He paid $1,500 at the time
of the purchase ; and the answer admits about $600 paid after-
wards, and endorsed.   The payment of sundry taxes upon these
lands, by the orator, is also admitted.   We can make and enforce
no decree of restoration of these monies.   They are not in the
hands of the defendant, who is administrator *de bonis non* of *Mur-
ray*, not of Watson.   It is presumable, that those monies have
gone for the benefit of Watson's estate twenty years since, and
could not now be recalled even if the executors and legatees of
Watson were made parties to this bill.

But, it is urged, that the orator is responsible for all this lapse

of time, because it does not appear, that he ever applied for a better title, nor that any adverse title has been set up against him. This, truly, does not appear. Neither does it appear, that payments have been called for by *Murray*, or his representatives, for about the same period. These afford balancing presumptions. The concern seems to have been abandoned on both sides, and lain dormant, till the late suit to obtain collection, or foreclose the mortgage.

CAIEDONIA,
*March*,
1831.

Williams
*vs.*
Murray's admr.

If these objections were less imposing than they are, still, if the defendant would urge upon the orator this confirmation of title, he ought to remove all presumptions of fraud in *Murray* in making and perfecting his contract with the orator. Fither party has a right to claim, that unintentional mistakes be rectified, making the opposite party as good, as if the mistakes had never happened : but the party, who has palmed a fraud upon another, has no claim to recover pay upon perfecting title afterwards. The appearances in this case are unfavorable to the defendant, without further explanation of the transactions of *Murray*, while his representations are so unlike the facts, which it was his duty to know.

A decree must be drawn up in due form by the solicitors for the orator according to the substratum now furnished ; the substance of which is, that the bond, included in the mortgage, be delivered up to the orator to be cancelled, within sixty days from the date of this decree ; that the defendant, and all in the same right, be perpetually enjoined from prosecuting any suit at law or equity upon said bond, and upon said mortgage ; that said suit at law, and said suit in chancery, predicated upon said bond and mortgage, be dismissed without cost to either party, and that the defendant pay to the orator the cost of this suit.

The reason why we allow the orator no cost upon these suits dismissed is, that the defendant, as administrator, is presumed to have found the bond and mortgage among the papers of the deceased, apparently in full force ; and might well have felt in duty bound to prosecute, without suffering the demands to grow more dubious by further delay.

*Fletcher & Cushman*, for orator.
*William & John Mattocks*, for respondent.